A. B. HOLBERT, Appellant, v. A. H. KELLER, Appellee.

**Pleadings:** AMENDMENT: DISCRETION. While it is the rule to allow and the exception to refuse amendments to pleadings it is not so absolute as to exclude all discretion in the trial court; but the discretion is a legal one and should be exercised with a view to the furtherance of justice.

**Same:** REFUSAL OF AMENDMENTS: DISCRETION. The refusal of an amendment is not erroneous when no substantial prejudice results; and the striking out of an amendment is not reversible error unless an abuse of discretion is shown.

**Same.** Where the parties have joined issue by pleadings of long standing and an amendment is offered on the eve of trial, presenting wholly new matter of which the pleader must have been advised at commencement of the action, and upon the strength of the new showing demands a change of forum, refusal of the court to allow the same or to strike it from the files, if filed without leave, is not ground for reversal.

**Same:** DEMURRER: WAIVER. By replying to defendant's answer plaintiff waived the right to a ruling upon his demurrer to a portion of the answer. Moreover in the instant case the matter demurred to was relevant to the issues, and if objectionable as pleading evidence it was not demurrable.

**Partnership:** DISSOLUTION: LIABILITY OF RETIRING PARTNER: EVIDENCE. In an action against a retiring partner for the price of horses placed with the firm for sale, in which the retiring partner claimed that upon dissolution of the firm the other partner took over the business, including the contract in question, and that plaintiff had thereafter recognized the continuing partner as the one liable on the contract, evidence that plaintiff and the continuing partner, some two years after dissolution of the partnership, made another contract in which there was no reference to the former partnership, was admissible in support of the defendant's claim that he had been released from liability on the contract in suit.

**Sales:** CONTRACTS: BAILMENT. It is a usual and reasonable rule that where the consignor or owner of property, by the terms of his contract, retains a right to demand a return of the property at any time without default on the part of the consignee, the contract is one of bailment or agency and not of sale; even though the consignee undertakes to become personally liable for all expense incident in the care and sale of the property, and to depend for his own profit upon a sale at more than the price fixed in the contract. And even if the terms buy and sell are used, if the consignee takes the property burdened with conditions inconsistent with the idea of his ownership, it may still be a contract of agency. Nor will the fact that the consignee agreed to advance the price of the property, either in money or notes, be conclusive evidence of a sale rather than a consignment for sale; and he may by the terms of his agreement be the agent of the consignee until the property is sold and then become the principal debtor to the consignor, without changing the character of the transaction from one of consignment to that of sale.

**Same:** CONTRACTS: CONSTRUCTION. The rule some times applied, that where the party receiving the property is not bound to return

the identical property but may account therefore in money or other thing of value constitutes a sale, has no application to bailments or consignments for sale. The contract in the instant case is held to be one of bailment for sale, constituting the partnership of which defendant was a member the agent of plaintiff for that purpose, and not a contract of absolute sale to the partnership.

**Partnership:** AGENCY: TERMINATION BY DISSOLUTION. Dissolution of a partnership, constituted an agent for the sale of property placed in its possession, terminates the agency as a matter of law.

**Same:** DISSOLUTION: TERMINATION OF AGENCY: LIABILITY OF PARTNERS. Where a partnership was appointed to care for and sell property, the agency covering no definite time, and the owner reserved the right to terminate the agency at any time by demanding a return to him of the property, it was competent for the partnership also to terminate the agency, upon accounting for sales made up to the time of its termination. And where the agency was terminated by dissolution of the partnership at a time when the partnership was not indebted for any property intrusted to it for sale and the owner notified of the dissolution and though so empowered did not recall the property, but permitted the continuing partner to retain possession thereof, thereafter dealing with him exclusively respecting the property, the retiring partner was relieved from further liability under the contract of agency.

*Appeal from Palo Alto District Court.*—HON. D. F. COYLE, Judge.

SATURDAY, SEPTEMBER 20, 191.

THE opinion sufficiently states the issues.—*Affirmed.*

*E. B. Stiles* and *Thomas O'Conner* and *Davidson & Burt,* for appellant.

*E. A. & W. H. Morling,* for appellee.

WEAVER, C. J.—The plaintiff is an importer of horses at Greeley, Iowa. During the period from the year 1904 to January 2, 1908, the defendant Keller and one Thompson were in partnership under the firm name of the Palo Alto

Stock Farm, though sometimes using the name "Thompson & Keller." The firm began business in Iowa but later removed to Boise, Idaho. Several business transactions took place between the parties. Of these but one is seriously here in question, though all have been mentioned in pleading and in evidence as affording light upon the subject of controversy. Stating them as briefly as possible, these dealings, or as many of them as we need mention, were as follows: On April 17, 1906, the parties entered into a written contract whereby plaintiff sold and delivered to Thompson & Keller a list of certain described imported stallions at the agreed aggregate price of $12,300; the plaintiff agreeing to accept payment therefor in good negotiable promissory notes which he should find to be acceptable. It is admitted that the debt thus contracted has been fully paid. Thereafter, on July 17, 1906, the plaintiff in writing "consigned" a certain described stallion to Thompson & Keller, who undertook to receive, care for, exhibit, and sell the same, and after deducting the expenses of sale the net remainder was to be divided equally between the parties. No limitation of price was provided for in the writing. On November 9, 1907, the plaintiff delivered to Thompson & Keller ten other stallions pursuant to a written contract of that date. As it is upon this agreement the controversy in the case arises, we here quote the same in full, omitting only the detailed descriptive list of the animals so delivered. It reads as follows:

### Contract.

This contract and agreement executed 9th day of November, 1907, by and between A. B. Holbert of Greeley, Delaware county, Iowa, and the Palo Alto Stock Farm, of Boise, Idaho, a copartnership consisting of N. W. Thompson and A. H. Keller of Boise, Idaho, witnesseth: That the said A. B. Holbert has this day delivered to the said Thompson and Keller the horses hereinafter designated; the same to be cared for, handled, and purchasers procured therefor by the said Thompson and Keller without claim upon or expense to the said A. B. Holbert.

The said Thompson and Keller agrees to keep said horses at all times free from all liens and claims of every kind, including claims for freight, stabling, feed and care, it being distinctly understood and agreed that said several horses are to be the property of the said A. B. Holbert and the title thereto to be and remain in him until sale thereof is made to responsible parties for not less than the price at which said several horses are hereinafter priced to the said Thompson and Keller, and good, negotiable, promissory notes or the cash, taken for the said herein described horses, to the amount of the agreed price, turned over to the said A. B. Holbert at Greeley, Delaware county, Iowa, with the guaranty of the said Thompson and Keller indorsed upon said notes and said notes to be approved by the said A. B. Holbert. It is further understood and agreed that said A. B. Holbert shall have his choice of all notes taken for said herein described horses and said A. B. Holbert agrees to select full sets of notes until he receives a sufficient amount equal to the total purchase price of said horses, and said notes to be turned to the said A. B. Holbert for his acceptance as soon as taken for the said herein described horses.

The said A. B. Holbert reserves the right to recall all or any of the horses delivered under this agreement at any time before sale when he deems it for his interest so to do, and when so recalled the said Thompson and Keller shall immediately deliver the said horse or horses so recalled to the said A. B. Holbert at his stables in Greeley, Delaware county, Iowa, without expense to the said A. B. Holbert, or shall immediately pay to the said A. B. Holbert at Greeley, Delaware county, Iowa, the price at which said horse or horses are hereinafter priced to the said Thompson and Keller.

It is further agreed and understood that on account of the extremely reduced prices to be received by the said A. B. Holbert for the said horses, said Thompson and Keller hereby release the said A. B. Holbert from any guaranty on said horses herein described and assume all risks of horses' lives, etc., after leaving the stables of said A. B. Holbert.

It is expressly understood and agreed that the said Thompson and Keller have no authority to bind the said A. B. Holbert except as specially granted by this contract, and all terms of this contract and all liabilities growing out of any failure of either party hereto to comply with any of its terms or conditions shall be enforceable in the court of Dela-

ware county, Iowa, which said courts are hereby given juris-diction to determine the same.

The horses which are to be delivered to the said Thompson and Keller under this contract and agreement and the prices at which the same are priced under this agreement are as follows, namely: Here the writing describes ten horses by name and registry to each of which is attached or fixed a stated price aggregating $14,000, after which list and descrip-tion the instrument proceeds in the following language:

. . . Making total price fourteen thousand ($14,000.00) dollars due A. B. Holbert and collectible from said Thompson and Keller according to the stipulations of this contract.

It is also stipulated that, if any of the said notes taken for any of the said above-described horses, should be sold for cash or any of the said above horses sold for cash, said Thomp-son and Keller agrees to pay the said A. B. Holbert for such horse in cash, and it is also agreed that when the notes are delivered to the said A. B. Holbert as herein indicated, they shall have with them property and bank statement showing their commercial value.

It is further agreed and understood if said Thompson and Keller do not return to said A. B. Holbert a net of $4,000 for the Hackney Stallion 'Stuntney Dinneford,' a horse which is not described in the within contract, that said Thompson and Keller agree to pay to the said A. B. Holbert at Greeley, Delaware county, Iowa, an additional $800 on the within contract.

No charge or commission shall be due to the said Thomp-son and Keller or any other person from the said A. B. Holbert for or on account of any sale, care or expense of any kind while said horses are held by the said Thompson and Keller, and said Thompson and Keller receive said horses upon the terms herein expressed and agree to immediately deliver to the said A. B. Holbert at Greeley, Delaware county, Iowa, the agreed price in cash, or the notes of the purchasers as above stated immediately after each sale, and agrees to make report to the said A. B. Holbert of the exact condition and location of said horses whenever requested so to do.

To the full and faithful carrying out of this contract, its terms and agreements, the parties hereto do bind them-selves, their heirs and representatives.

[Signed] A. B. Holbert.
[Signed] Thompson & Keller.

On the same day in another writing plaintiff "consigned" to Thompson & Keller three other stallions to be received by the defendants and sold and accounted for by them upon substantially the same terms as are contained in the prior article of consignment already mentioned as having been made under date of July 17, 1906. On July 21, 1910, this action was begun at law to recover a remainder alleged to be due from the Palo Alto Stock Farm, otherwise Thompson & Keller, and from the appellee Keller as a partner in said firm. The petition is stated in separate counts. Admitting payment for the horses delivered to Thompson & Keller under the contract of April 17, 1906, it declares upon the contract of November 9, 1907, as a contract of sale and alleges failure by the defendants to make payment according to its terms. It further alleges that the horses delivered to the firm under the separate consignment contracts of July 17, 1906, and November 9, 1907, were sold and disposed of by said Thompson & Keller, who made report thereof to the plaintiff and paid in part only his proportion of the proceeds of said sales; the remainder being still due and unpaid. In aid of the action thus brought, plaintiff sued out a writ of attachment and caused the same to be levied upon a tract of land owned by Keller in this state. The defendant Keller, who alone is contesting, denies that the firm ever purchased the horses described in the contract of November 9, 1907, which is hereinbefore set out in full, and contends that said contract is one of agency only and not of sale. He admits the contracts made under date of April 17, 1906, and July 17, 1906, and alleges that the same have been fully performed on the part of the firm. He further pleads want of knowledge of the contracts under date of November 9, 1907, and alleges that if made at all they were made by Thompson without authority to bind the firm therefor. This issue, as we understand the record, is not insisted upon by appellee on this hearing. He further pleads that on January 1, 1908, the partnership between himself and Thompson was dissolved, and that he

then retired therefrom and from the business. He avers that none of said horses had been sold or disposed of when the firm was dissolved, that plaintiff, knowing of said dissolution, permitted Thompson to retain possession thereof as his sole agent and as such to handle, sell, and dispose of said property, whereby defendant is relieved of any liability in the premises. He still further pleads that by the agreement of dissolution Thompson, who retained the business, assumed and agreed to pay all the partnership liabilities and to indemnify and hold the defendant harmless against all claims of that nature, and that plaintiff, being fully aware of that fact, thereafter dealt exclusively with Thompson in his individual capacity and looked to him exclusively for the performance of the contracts in suit, accepting him as the sole and only person liable thereon, thus relieving defendant from further obligation thereunder. By way of counterclaim he alleges that the attachment levied upon his property was wrongfully obtained and demands recovery of damages for injuries so occasioned.

After issue thus joined the plaintiff filed an amendment to his petition alleging that, at the time of the dissolution of the partnership between Thompson & Keller, the firm was indebted to the First National Bank of Emmetsburg and had secured such indebtedness by the deposit as collateral of a large number of promissory notes which, subject to the rights of the bank, became the property of Thompson under the agreement of dissolution. He further alleges that in May, 1909, Thompson agreed that, if the plaintiff would take up the firm debt of $5,000 to the bank, he (Thompson) would assign all of said collateral to plaintiff. To this agreement he says he procured the consent of Keller, who in violation of such consent and of the rights of Thompson and plaintiff in the premises went himself to the bank, paid the debt, and took and received the collateral into his own possession, thereby depriving plaintiff of the benefit of his agreement with Thompson. He avers that he has offered and is ready and willing to pay the said note of $5,000 given the bank

and asks that his right to demand and receive said collateral subject to this lien be established and enforced by appropriate decree, and that Keller be required to account for such property. On the pleadings as thus amended plaintiff moved that the cause be transferred to the equity calendar and set down for trial to the court, and, if the issues at law and equity be severed, that those of an equitable nature be first tried. On motion of the defendant the amendment here mentioned was stricken out because it sets up an independent cause of action, triable only in equity, against the defendant Keller personally and not against the partnership, which is made principal defendant in this original proceeding at law, and because there is a misjoinder of parties and causes of action. Thereupon plaintiff filed another motion for an order allowing him without further notice to file a petition in equity setting forth a cause of action substantially as had been stated in the pleading stricken from the files, and that the court fix the time for the filing of such petition and of the defendant's answer thereto. This motion was also denied. Following this ruling the plaintiff once more tendered an amendment to the petition, repleading substantially the same matter which he had pleaded as ground for equitable relief in the amendment stricken from the files, and in addition thereto alleged that Keller had taken up the collateral held by the First National Bank with intent to defraud the plaintiff of his rights obtained therein under an assignment executed by Thompson, and that in furtherance of said fraud said Keller had caused the note held by said bank to be indorsed and turned over to one Hawks. He further alleged that defendant had collected upon the collateral enough to pay the note in full and had wrongfully converted the remainder to his own use, to the damage of the plaintiff in the full amount of the claim originally sued upon. To the filing of this amendment the defendant Keller objected because the amendment upon its face shows that the acts complained of do not amount to a conversion of the collateral, or that plaintiff has been injured

thereby, also because the defendant had come from a distant state to try the issues already made and was unprepared to try the issues raised by said amendment. He further averred that Hawks, whose name was here for the first time introduced into the case, was a resident of the state of Washington, and his presence as a party or witness could not then be procured, and that a trial of such issue would require the taking of the evidence of many witnesses not then within reach of subpœna concerning the value of said notes and the solvency or insolvency of the makers thereof as well as other questions of an equitable nature which could not properly be considered in this case. It was also objected that the amendment was in effect a repleading of the same matter which had already been stricken by order of the court. The objections were sustained and the filing of the amendment refused. Thereupon plaintiff filed a reply denying all the affirmative matter alleged in the amended answer. Thereafter plaintiff demurred to a part of the answer, but the demurrer does not appear to have been ruled upon.

There are other amendments to the petition and answer, most of which are not material to the questions raised on this appeal or are a mere repetition in more specific form of matters already pleaded. So far, if at all, as it may become necessary to consider them, their substance will be stated when that point is reached in the discussion.

The issues were tried to a jury. When the parties had rested, the plaintiff moved for a directed verdict on the contract of November 9, 1907, because said agreement is a contract of sale and the agreed price of the horses has not been paid, because defendant has failed to sustain any of the defenses which he has urged thereto, and because, even if the contract be one of agency, it is shown without dispute that Thompson in selling the horses was acting for the partnership, and Keller as a partner is liable to account therefor to plaintiff. The plaintiff also moved for a verdict in his favor for $551.51 as the admitted remainder due him upon horses

consigned to the partnership for sale and division of the net proceeds.

The defendant at this point dismissed his claim for damages upon the attachment bond. The defendant also moved for directed verdict in his favor because it appears without dispute that the horses were delivered or consigned to Thompson & Keller under a contract of agency, and that after the dissolution of the firm, and with knowledge thereof, plaintiff elected to recognize and treat Thompson as his sole agent for the purposes of the contract, and that, as relates to sales made of said horses after the dissolution of the partnership, Thompson had no authority to bind the defendant, and because on the undisputed evidence the defenses pleaded by the defendant have been fully sustained.

The court sustained plaintiff's motion for a directed verdict in the sum of $669.78 and no more; that sum presumably being the amount the court found to be unpaid to plaintiff upon his share of the proceeds of horses consigned to defendants for sale without limitation of price and division of the proceeds. From the ruling upon the motion to direct and from the judgment entered thereon, plaintiff appeals.

I. Error is first assigned on the court's denial of plaintiff's motion to transfer the cause to equity for trial, also in striking out the amendment setting forth grounds of equitable relief and in refusing plaintiff leave to set up practically the same matter as an amendment to its petition for a recovery at law.

These rulings may be considered together. While the allowance of amendments is the rule and their refusal the exception under our practice, the rule is not so absolute as to exclude all discretion in the trial court.

1. PLEADINGS: amendment: discretion.

See *Brockman v. Berryhill*, 16 Iowa, 183; *Hays v. Turner*, 23 Iowa, 214; *State v. Mayor*, 18 Iowa, 388; *Phillips v. Van Schaick*, 37 Iowa, 229; *Clough v. Adams*, 71 Iowa, 17. The discretion is of course a legal

one and should be exercised with a view to the furtherance of justice. *Cole v. Laird,* 121 Iowa, 146.

The refusal of an amendment is not error when no substantial prejudice results. *Mill Co. v. Prenzler,* 100 Iowa, 540; *Guyer v. Mfg. Co.,* 97 Iowa, 132; *Insurance Co. v. Melcher,* 132 Iowa, 324. The striking out of

2. SAME: refusal of amendments: discretion.

an amendment will not be a reversible error unless an abuse of discretion by the trial court is made to appear. *Bay v. Monroe County,* 121 Iowa, 302; *Davis v. Boyer,* 122 Iowa, 132; *Chlein v. Kabat,* 72 Iowa, 291.

The rulings here complained of were all within the sound discretion of the court. The case had been pending nearly a year. Five months before the term at which it was reached

3. SAME.

for trial, plaintiff had filed an amended and substituted petition as a declaration of the nature of the claim on which he demanded a recovery, and defendant had taken issue thereon by answer. When the trial term arrived he came from a distant state to try the issue thus joined. At this stage plaintiff again appeared with another amendment alleging wholly new matter, of all which he must have been advised before this action was begun, and upon the strength of this new showing demanded a transfer of the cause to the equity calendar. It is doubtful whether the claim thus pleaded may properly be joined with the one stated in the petition; but, passing that question, we are disposed to hold that upon the undisputed record the court did not abuse its discretion. The right to amend should not be made use of to harass an opposing party or to unnecessarily prolong litigation; and, if the court may fairly conclude that the furtherance of justice requires the denial of a belated amendment and that the parties shall proceed to trial upon the issues already joined, its ruling refusing the same or striking an amendment filed without leave will not be held ground for reversal. Broad as it is, and perhaps because of its liberality, the rule allowing amendments is not infre-

quently abused, resulting in great confusion in the records which come to us for review and serving often to obscure the real merits of the controversy, and the trial courts should not be so hampered that they may not reasonably exercise their authority to hold such tendencies in check. The assignments of error upon the rulings here under consideration must be overruled.

Nor did plaintiff suffer any prejudice by the failure of the court to rule upon his demurrer to a portion of the answer. He had already taken issue upon the answer by filing a reply, thereby waiving his right to demur thereto.

4. SAME: demurrer: waiver.

Moreover, the matter demurred to appears to us to have been relevant to the dispute between the parties, and, even if open to objection as the pleading of evidence it was not demurrable.

II. The defendant was allowed to put in evidence, over plaintiff's objection, a certain written contract made between the plaintiff and Thompson under date of February 18, 1910, two years after the dissolution of the partnership of Thompson & Keller. We are of the opinion that the contract was both competent and relevant testimony. One of the claims made by defendant is that, from and after the dissolution of the partnership, plaintiff recognized Thompson as his sole agent with reference to the horses in question and did not recognize the defendant Keller as having any interest in said dealings or as being under any obligation with reference thereto. The contract appears to have a legitimate bearing upon this feature of the dispute. It is made between plaintiff and Thompson alone. It describes Thompson as the party indebted for the horses, and he individually undertakes to assign to plaintiff to apply on said debt all of the collateral which had been deposited in different banks to secure the partnership obligations. By the same instrument plaintiff agrees that, if he realizes from the collateral more than enough

5. PARTNERSHIP: dissolution: liability of retiring partner: evidence.

to pay his claim, he will return the remainder to Thompson.
The contract makes no reference to the partnership nor to
Keller but deals with the subject of the alleged indebtedness
as the individual obligation of Thompson.   True this is not
in itself conclusive that plaintiff had relinquished his claim
upon Keller (if any he had), or that he had consented to the
assumption of the obligation of the firm by Thompson, but
it is a relevant circumstance bearing on that question. There
was no error in overruling the objection to this evidence.

III.  We now come to the question to which counsel have
given principal attention.   Is the contract of November 9,
1907, which we have set out at large, an agreement of sale,
or does it evidence a mere bailment or contract

6. SALES : con-
tracts : bail-
ment.

of agency ?   Reading the contract as it is
written without looking for any concealed
meaning or any merely inferential condition or stipulation,
it appears very clearly not to be an agreement of purchase
and sale.   And if the language or meaning be thought obscure,
and we resort to a reading thereof in the light of the previous
dealings and contracts between the parties, the conclusion
we have above expressed is materially strengthened and con-
firmed.   It contains no provision which is inconsistent with
a mere bailment or agency.   It carefully avoids the use of
the words ''purchase'' and ''sale'' as between the parties
and emphasizes clauses and stipulations which negative such
conclusion.   That the parties chose the language employed
intelligently and with due regard to its meaning and its
limitations is shown when we compare this agreement with
the prior one made April 17, 1906.   The general form of
these two agreements indicates that the parties made use in
both instances of a stock form of contract in which they
sought to vary some of the vital words and clauses to make
the two instruments express different meanings.   For example,
the earlier contract ''witnesses that the party of the first part
has *sold* and delivered to the second party the horses herein-
after designated for the sum of $12,300 ; payment thereof by

said second party to be made as hereinafter designated.''
The contract in suit ''witnesses that the said A. B. Holbert
has this day *delivered* to the said Thompson & Keller the
horses hereinafter designated; the same to be cared for,
handled, and purchasers procured therefor by Thompson &
Keller without claim upon or expense to the said A. B.
Holbert.'' In the present contract also it is expressly stipu-
lated that Holbert retains title to the property in himself and
reserves the right to recall at any time all or any of the
horses from the possession of Thompson & Keller, who under-
take to redeliver them on demand. No such provision is
found in the first contract. In other respects, which we can-
not pause to set out specifically, the two papers are marked
by significant contrast; the earlier being clearly and con-
clusively a contract of sale; the latter no less clearly showing
the purpose of the parties to make an agreement which shall
not amount to a sale.

There is no principle of law making it legally impossible
for the owner of a chattel to consign or deliver it to an agent,
factor, or broker for sale without creating the relation of
seller and purchaser between the parties, and this is no less
true if the consignment be made with a stipulation fixing
the net price at which the agent shall account for it when
sold or the manner and method in which the accounting shall
be made. Nor does it affect the legal quality of such trans-
action if there be a further stipulation by which the consignee
may at his option become a purchaser. Indeed, consignments
to agents and factors for sale are among the most familiar
transactions in the business world. It is to be conceded that
the distinction between an agency contract and a sale is not
always clear, and border line cases are frequently encountered,
the decisions of which are not easily reconcilable. It is
further true that, where controversy arises between the parties
thereto, a contract will sometimes be construed and enforced
as creating an agency only when, as between them and a
third party, it might be given effect as a sale. Cases are also

to be found in which courts have endeavored to make the distinction turn upon the presence or absence of some particular contract provision, but it may safely be said that none of them lays down a rule or establishes a test which is universally applicable. Perhaps the most usual and most reasonable rule is that, if by the terms of the contract the consignor or owner of the property retains a right to demand a return thereof at any time without default on the part of the person to whom it is delivered, the transaction is to be held one of bailment or agency and not of sale. *In re Flanders,* 134 Fed. 560 (67 C. C. A. 484). And this is none the less applicable if the consignee undertakes to be personally liable for all expenses and depend for his own profit upon his ability to sell the goods for more than the price fixed in the contract. *John Deere Plow Co. v. McDavid,* 137 Fed. 802 (70 C. C. A. 422) ; *In re Columbus Buggy Co.,* 143 Fed. 859 (74 C. C. A. 611) ; *Lance v. Butler,* 135 N. C. 419 (47 S. E. 488) ; *Walker v. Butterick,* 105 Mass. 237.

Even where the terms "buy" and "sell" are employed, if the person receiving the property takes it under burdens or conditions inconsistent with the idea of ownership on his part, it may still be held a contract of agency. *Osborne v. Josselyn,* 92 Minn. 266 (99 N. W. 890) ; *Willcox v. Ewing,* 141 U. S. 627 (12 Sup. Ct. 94, 35 L. Ed. 882). Where a defendant received cattle from another person to care for, feed, and sell the same, taking the risk of all losses and accepting as his compensation the profit to be made in selling them at prices in excess of a stated amount named in the contract, it was held a contract of agency and not of sale. *Union Stock Yards Co. v. Land & Cattle Co.,* 59 Fed. 49 (7 C. C. A. 660). Nor is the fact that the consignee agrees to advance the price of the property in money or in his own notes conclusive evidence of a sale instead of a consignment for sale. *Bayliss v. Davis,* 47 Iowa, 340. A consignee may by the terms of his agreement be the agent of the consignor until the goods are sold and then as between himself and

the consignor become the principal debtor for the thing sold without changing the character of the transaction as one of consignment and not of sale. *Nutter v. Wheeler,* Fed. Cas. No. 10,384.

The rule or test sometimes applied that, where the party receiving the property is not bound to return the identical thing so received but may account therefor in money or other property or thing of value, the transaction is

7. SAME:
   contracts:
   construction.

a sale, has no' application whatever to bailments or consignments for sale, *Barnes v. Bloch,* 38 W. Va. 158 (18 S. E. 482, 22 L. R. A. 850, 45 Am. St. Rep. 846), for the very purpose of such consignment is that the agent or factor shall dispose of such property and account therefor in something else—money, notes, or property.

The cases in which contracts, having provisions essentially similar to those in this contract, have been construed to be contracts of agency are numerous. In addition to those already cited we may mention as having more or less bearing upon the question: *Conable v. Lynch,* 45 Iowa, 84; *Wasey v. Whitcomb,* 167 Mich. 58 (132 N. W. 572); *Sturtevant v. Cumberland,* 106 Md. 587 (68 Atl. 351, 14 Ann. Cas. 675); *Rosencranz v. Hanchett,* 30 Ill. App. 283; *Weir Plow Co. v. Porter,* 82 Mo. 23; *Norton v. Melick,* 97 Iowa, 564. While these and other precedents which might be mentioned are not identical in matters of fact, they do involve the distinction to be drawn between sales and consignments for sale, and the rules there discussed and approved have direct bearing upon the question now before us. The principle which obtains in the construction of this as well as of all contracts is to ascertain the intention of the parties from the language in which their agreement is framed, read in the light of all the admitted or proved circumstances. *Marble Co. v. Brow,* 109 Cal. 236 (41 Pac. 1031, 50 Am. St. Rep. 37). There is no apparent obscurity in this contract. By its express terms, as we have already noted, the plaintiff delivers to Thompson & Keller certain horses "to be cared for, handled,

and sold and purchasers procured therefor,'' and the consignees undertake to account for them when sold at stated prices in notes or cash acquired from such sales. The other stipulation by which Thompson & Keller assume the expense of the keeping, care, and sale of the horses and the risk of loss in the transaction is not inconsistent with the relation of consignor and consignee for the purposes of sale. Nowhere in the agreement do the consignees undertake to purchase or pay for the horses except as they agree to account for sales made. It may be true that upon a sale being made the consignees under the terms of their agreement to account would become directly and personally liable to the consignor; but, even if they were to be held as purchasers, from that moment the relations of the parties before any sale was effected remained that of principal and agent or bailor and bailee for sale. See *Nutter v. Wheeler, supra; Power Co. v. Hildebrand,* 137 Ind. 462 (37 N. E. 136, 45 Am. St. Rep. 194).

Had the transaction been intended as a sale, absolute or conditional, there is no apparent reason why the parties did not say so. That they knew how to use appropriate language to make a sale is shown by the contract they had made in the prior transaction. Again, if it was intended to be a sale there was no occasion to stipulate that the horses were to be cared for, handled, and sold without expense to Holbert or to provide that Thompson & Keller should have no authority to bind him ''except as specially granted'' in the contract, for, if Thompson & Keller became the owners of the property, they could not in any way lawfully impose upon the seller the expense of caring for, keeping, and selling their own property. If it was a sale, then plaintiff would have no authority to fix a minimum price at which the consignees were authorized to sell the horses. The fixing in advance the price at which a consignee for sale must account for property delivered to him and providing that he may make settlement in promissory notes taken by him upon such sales, with or without his personal guaranty as may be agreed upon, is a

provision which is extremely common in the business world and has no effect to convert what would be otherwise a mere consignment into a sale. If the party receiving the consignment has enough confidence in his judgment of market values to satisfy him that he can afford to assume the risk of undertaking to sell the property for an amount which will enable him to settle with his consignor at the stipulated price and leave him a margin sufficient to pay all the expenses of the consignment and afford him a reasonable profit, there is no reason in law why he may not enter into such a contract without assuming the obligations of a purchaser. There is no suggestion in the record of any reason why the parties should attempt to conceal the real nature of their dealings or to so frame the writing as to give the transaction the surface appearance of a contract of bailment or agency when the real intent and purpose was to make a sale, and the court ought not by forced construction to give it such effect.

It is further suggested by the appellant that the fact that on the same day the parties entered into another contract as to three other horses, unquestionably providing for a mere consignment, is evidence that the contract we have been discussing was intended as something else. But an examination of the two instruments leaves no room for such inference. The three horses referred to were animals which for some reason (not hard perhaps to understand) plaintiff desired to sell or get rid of at the best obtainable price and was willing to consign them to Thompson & Keller without restriction as to price and without requiring the consignees to assume any responsibility for the expenses of keeping, handling, and selling and to receive in satisfaction of any claim so accruing to him one-half the net proceeds of the transaction. These terms were much more liberal and conditions much less exacting then he proposed to concede with respect to the other horses. It was not only proper but a natural thing for the parties to treat the two transactions separately and make them the subject of independent contracts, and yet neither

amount to a contract of sale. Our conclusion upon the whole record is that the contract in question was one of consignment for sale, and the trial court did not err in so ruling.

IV. Appellant takes the position that, even if the contract be construed as one of agency or as witnessing a mere consignment for sale, yet as Thompson, who retained possession of all the horses and continued the business after Keller retired from the firm, has since said dissolution sold and disposed of the horses, Keller is still charged with liability to account to plaintiff for the horses at the listed prices. Upon this proposition the trial court held that the agency granted by the plaintiff was to the firm of Thompson & Keller, and that the dissolution of the firm worked a revocation or discontinuance of the agency after which Thompson had no power or authority to bind either the plaintiff or Keller by any sales made by him, and that, the plaintiff having with knowledge of such dissolution permitted Thompson to go on and handle and sell the horses and having approved or ratified the sales made by him, he must be held to have recognized Thompson as his sole agent and to have no recourse upon Keller for an accounting for sales so made. In this also we think there was no error. That the dissolution of the partnership did work a discontinuance of the agency is clear. The general rule of the common law is that an authority by a principal to two persons to do an act is joint, and the act must be concurred in by both. Dunlap's Paley on Agency, 177; Story's Agency, section 42.

8. PARTNERSHIP: agency: termination by dissolution.

"When a firm is appointed to an agency, this rule would necessarily be modified to the extent that either member of a firm could do any act within the scope of the agency the same as he could perform any other partnership act. By appointing a partnership firm it would be implied that the authority was joint and several. But upon dissolution of the firm such agency would cease." *Martine v. Insurance Co.,*

53 N. Y. 340 (13 Am. Rep. 529). See, also, *Turk v. Nicholson,* 30 Iowa, 407.

Now in the case in hand the agency given to Thompson & Keller was for no specified period. The plaintiff reserved a right to put an end thereto at will by recalling the horses.

9. SAME: dissolution: termination of agency: liability of partners.
The effect of this provision and of the failure of the contract to specify the time when the contract would cease was to make it competent for the agents also to terminate the relation at any time, accounting, of course, for any sales they had made. *Wilcox v. Ewing,* 141 U. S. 627 (12 Sup. Ct. 94, 35 L. Ed. 882); *Newhall v. Printing Co.,* 105 Minn. 44 (117 N. W. 228, 20 L. R. A. [N. S.] 899).

At the time when the partnership was dissolved and the agency terminated by operation of law, there was nothing due or owing to plaintiff under the contract. No horses had been sold and no duty to account had yet been incurred. The plaintiff, being notified of the dissolution, was of course in position where he could properly refuse to permit either partner to proceed alone in the transaction of the business and could rightfully have demanded a return of the horses to him, a demand compliance with which he doubtless could have enforced against both or either of the former partners. But he was not bound so to do. He could recognize the terms of the dissolution by which Thompson individually retained possession of the horses and control of the business and permit him to proceed as his agent or factor to make sales. This it clearly appears he elected to do. Thereafter he appears to have dealt exclusively with Thompson. His correspondence was with Thompson. In a letter to Thompson personally within a very short time after the partnership had been dissolved, he expressed his anxiety that Thompson should soon report sales "and lots of them." Two years after such dissolution he entered into a contract (already mentioned) with Thompson personally for the security of his claims by the

deposit of collateral. The contract is signed by Thompson only, and the name of the firm or of Keller or the existence of any partnership obligation is nowhere mentioned or suggested. His conduct is explicable upon no other reasonable hypothesis than that he recognized the dissolution of the partnership as a termination of the agency, so far as Keller was concerned, and was content to carry on the transaction with Thompson as his sole agent or factor. It follows of necessity that he must look to Thompson alone to account for the sale which he both expressly and impliedly authorized after Keller had retired from the business.

We cannot prolong this opinion for further review of the authorities. None upon which appellant relies is inconsistent in principle with the conclusions we have announced. Cross-assignments of error have been filed by the appellee upon the ruling of the trial court directing a verdict for the plaintiff. They are not urged upon our attention with any insistence, and we shall take no time for their discussion except to say it appears without controversy that Thompson & Keller disposed of the three or four horses which had been consigned to them for sale without limitation of price upon the joint account of plaintiff and themselves, and that an account thereof had been rendered showing due the plaintiff thereon, after deducting all credits, the sum for which, with interest, the verdict was directed. There was no question of fact concerning the transaction to go to the jury, and the order directing a verdict was properly made.

We find no cause for ordering a new trial, and the judgment below is in all respects *Affirmed.*